## Still vs. The Trustees of the Village of Lansing-burgh.

In 1790, L., the original proprietor of a village, caused it to be surveyed and laid out into lots, streets, alleys, and a *public square*, and filed a map of such survey in the county clerk's office. In 1793 the three sons of L., who, upon his death, had become seised of all his real estate, conveyed the public square to the trustees of the village, to have and to hold the same in trust for the freeholders and inhabitants of the village, and also upon the further trust forever thereafter *to permit and suffer the stockholders of the church in said village,* their heirs, &c. *to erect a church for divine service, upon said square, and to use, occupy, possess and enjoy the same.* Soon after this conveyance, the *cestuis que trust* erected a church upon the public square, which they, and their successors, occupied for many years. In 1834 the trustees of the village executed a deed to the trustees of the church, of a part of the public square, including the site of the church. This conveyance was executed without any consent being obtained from the freeholders and legal voters of the village, although the charter of the village contained a provision that none of its real estate should be sold without the consent of the freeholders and other legal voters of the village, or a majority thereof. In 1845 the trustees of the church, having obtained permission from the court of chancery, sold and conveyed the same premises to M. and the plaintiff, S.; and M. subsequently released his interest in the premises to S. The church building was torn down and removed in 1845. *Held* 1. That by the conveyance from the sons of L. to the trustees of the village there was secured to the public the perpetual use of the square, as public ground, and to the stockholders of the church, and their successors, the right of erecting and maintaining thereon a house for divine service. That the latter acquired only the right of using the land for a single, definite purpose; and that their right was, in contemplation of law, an *easement* merely, and not a grant of the soil.

2. That so long as the church remained, its owners, as the successors or assigns of the original stockholders, had the right to occupy and enjoy it. But that when it was removed, all their rights terminated, and the right of possession reverted to the trustees of the village, as the holders of the legal title.

3. That the deed executed by the trustees of the village to the trustees of the church was inoperative and void, as being a clear violation of the express trusts upon which the land was held by them; and because it was executed without the consent of the freeholders and other voters, required by the charter of the village to be first obtained.

4. That the plaintiff acquired no title to the premises in question.

Case *submitted without action, pursuant to the* 372d *section of the code.* The material facts in the case are as follows:.

Abraham J. Lansing was the original proprietor of that part of the village of Lansingburgh known as the first division thereof. In 1790, he caused it to be surveyed and laid out into lots, streets, alleys, and a *public square.* A map of this survey was made and filed in the clerk's office of Albany, and the lots designated on said map have been sold and conveyed as thus designated. On the 10th of July, 1793, the three sons of Abraham J. Lansing, who, upon his death, had become seised of all his real estate, conveyed to "the trustees for the freeholders and inhabitants of that part of the town of Troy commonly called Lansingburgh," the public square as designated on the map made in 1790, "to have and to hold the said piece, parcel or tract of land and premises, with the appurtenances, unto the said trustees, for the freeholders and inhabitants aforesaid, and their successors, in trust to and for the common use and benefit of the freeholders and inhabitants aforesaid forever. *And also upon this further special trust, that they the said trustees and their successors shall forever hereafter permit and suffer the several persons known by the name of the stockholders of the church in Lansingburgh, their heirs, executors, administrators and assigns, to erect and build, or cause to be erected and built, a church for divine service on such part of said premises as they may think proper, and use, occupy, possess and enjoy the same, and all and singular the rents and profits arising therefrom, and appropriate the same for their own proper use, benefit and behoof.*"

About the time of this conveyance, an association was formed called "the stockholders of the church in Lansingburgh." This association proceeded to erect a church upon the public square, which they occupied until the 14th of May, 1799, when a majority of the stockholders united with other persons and incorporated themselves under the name of "The First Presbyterian Church and Congregation in Lansingburgh." This corporation continued for thirty years to occupy the church.

On the 19th of May, 1834, the trustees of the village of Lansingburgh, under their respective hands and seals, executed a deed to "the trustees of the first Presbyterian church and con-

gregation in Lansingburgh," for a part of the public ground, including the site upon which the church had been erected. The lot thus released was 200 feet long and 120 feet wide. The trustees of the church at the same time released to the trustees of the village the residue of the public square. No consent of the freeholders and legal voters of the village was obtained to the conveyance executed to the trustees of the church, nor was any authority for either of the conveyances obtained from any court.

On the 6th of June, 1845, the trustees of the church obtained permission from the court of chancery to sell the premises conveyed to them by the trustees of the village, and on the 18th of May, 1847, they executed and delivered to Henry A. Mercer and George Still, the plaintiff, a deed of the premises. Subsequently, Mercer released his interest in the premises to Still. The church building was torn down and removed in 1845. The trustees of the village had taken possession of the premises and claimed to hold them, as against the plaintiff. He, on the other hand, claimed that the trustees should be adjudged to surrender the premises to him.

*Samuel Stover*, for the plaintiff.

*M. L. Filley*, for the defendants.

*By the Court*, HARRIS, J. The obvious intention of the original proprietor of the land in question was, to dedicate the public square he had laid out, to the public use. Lots in the vicinity were sold and conveyed with reference to the advantages of such an easement. The purchasers of adjacent lots acquired a beneficial interest therein, of which they could not legally be deprived. In connection with this public use, it was the intention of the proprietor that the square should, as is often the case in such towns, furnish the site of a church. These objects were not inconsistent with each other. Trustees were created by law, for the purpose of receiving the title, and subsequently, by an act of the legislature, the title was vested in the corporation

of the village. See act to appoint trustees to take and hold certain lands therein mentioned and for other purposes, passed April 5, 1790, § 2; and the act " authorizing the comptroller to loan moneys belonging to the school fund, and for other purposes," passed April 12, 1813, § 5.

By means of the conveyance from the original proprietor to the trustees, there was secured to the public the perpetual use of the square as public ground, and to the persons who might associate for that purpose, the right of erecting and maintaining thereon " a house for divine service." The deed to the trustees does not profess to vest in the stockholders of the church any right of property in the land. It was not intended that they should have any such right. That was vested in the trustees, for the uses expressed in the conveyance. But the deed did secure to the stockholders of the church, and their heirs, executors, administrators and assigns, the exclusive possession of so much of the square as they might have occasion to occupy for the specific purpose mentioned in the deed, and for so long a time as they might choose to occupy it for that purpose. The freehold was vested, first, in the trustees created for that purpose, and, afterwards, in the corporation of Lansingburgh. The stockholders of the church and their successors acquired only the right of using the land, for a single definite purpose. Their right was, in contemplation of law, an easement, and not a grant of the soil.

*Pomeroy* v. *Mills,* (3 *Vermont Rep.* 279,) presents a case quite analogous. The original proprietors of the town of Burlington had set apart a public square for the use of the public. They had also passed a vote, declaring that the square might be used as a site for " all necessary county and town buildings." The inhabitants of the town, in 1821, passed a vote authorizing the selectmen to lease a portion of the square to the defendants in the action. This they did, and the defendants erected thereon a printing office. The plaintiff, as the grantee of one of the original proprietors, brought ejectment to recover the premises thus leased. The action was sustained. The court held that the square having been laid out by the proprietors for that purpose,

and having been so used for nearly 40 years, had become a public highway; that in addition to this public right of way, which was common to all, the town and county had also the right of erecting upon the square their necessary public buildings, and that the latter right, like the right of way, was an easement upon the land, and not an interest in the land itself. " No property in the land," says Prentiss, Ch. J. " was conveyed. None was necessary for the purposes to which it was intended to appropriate it. There was no grantee in whom a legal estate could vest. The right granted must be regarded as a mere easement, and as the vote excludes any use or occupation of the square for other purposes than a highway and sites for public buildings, it follows that the town of Burlington could not convey to the defendants a right to an exclusive possession of any portion of the square."

When the stockholders of the church had built their house upon the square, they acquired, in its site, very much the same interest that the public acquires in the land taken for a highway. The owner, while he cannot lawfully interrupt the public in the enjoyment of the easement, retains his exclusive right to the soil, and may maintain his action for any encroachment upon it. Even where, by an act creating a turnpike corporation, it was provided than the title to the lands acquired for the purposes of their road should vest in the company, it has been held, that such title vested only for the purposes of the road, and, when abandoned, that the title reverted to the original owner. (*Hooker* v. *The Utica and Minden Turnpike Co.* 12 *Wend.* 371. *Adams* v. *Emerson,* 6 *Pick.* 57.) The same principle has recently been maintained by this court, in *The People* v. *White,* (11 *Barb.* 26.) See also *Tucker* v. *Town,* (9 *Pick.* 109;) *Boston Water Power Co.* v. *The Boston and Worcester Railroad Co.* (16 *Pick.* 512;) *Jackson* v. *Babcock,* (4 *John.* 418;) *Jackson* v. *Hathaway,* (15 *Id.* 447.)

In this case, the right of property in the site of the church was not necessary to its enjoyment for the purposes to which it was devoted. There is no evidence of any intent that the stockholders of the church should acquire any interest in the soil.

Under these circumstances, I know of no rule of construction which would give to them more than an exclusive right of possession so long as they might choose to occupy the square for the purposes specified in the grant. They were entitled to an easement, but the title continued in the trustees. It cannot be doubted that this construction will most effectually satisfy the intentions of the original proprietors. The square is situated in a populous village. It communicates with public streets leading in various directions. It may be presumed that buildings have been erected around it. It was in anticipation of this condition of things, that the proprietors took measures to secure to the inhabitants of the village, forever, the benefits of the square as public ground. This was their primary object. The use of it, as the site of a church, was undoubtedly regarded as a secondary object, not inconsistent with the general purposes for which it was intended. So long as the church remained, its owners, as the successors or assigns of the original stockholders, had the right to occupy and enjoy it. But when it was removed, all their rights terminated.

The deed executed in 1834, by the trustees of the village to the trustees of the church, was wholly inoperative. Assuming that it was executed in such a manner as to make it the deed of the corporation, and not of the individuals who executed it, no authority had been conferred upon them to make such a conveyance. It was a clear violation of the express trusts upon which the land was held. And, besides, it is expressly declared in the charter of the village, that no real estate shall be sold " without the consent of the freeholders and other legal voters of said village, or the major part thereof, to be given at a public meeting duly notified." It is not pretended that this consent was ever obtained. The deed was therefore unauthorized and void. Of course the plaintiff has no title to the land in question, and judgment must be rendered for the defendants.

[ALBANY GENERAL TERM, December 6, 1852. *Parker, Wright* and *Harris,* Justices.]